[Cite as *In re K.L.*, 2017-Ohio-1305.]

## IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

IN RE:  K.L., C.L., A.L. and K.L.

C.A. CASE NO. 27418

T.C. NOS.   2014-3944; 2014-3945;
2014-3946; 2014-3948

(Civil Appeal from Common Pleas
Court, Juvenile Division)

. . . . . . . . . . .

# O P I N I O N

Rendered on the ___7th___ day of _____April_____, 2017.

. . . . . . . . . .

ALICE B. PETERS, Atty. Reg. No. 0093945, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
        Attorney for Plaintiff-Appellee

ROBERT ALAN BRENNER, Atty. Reg. No. 0067714, 120 W. Second Street, Suite 706, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

DONOVAN, J.

{¶ 1}  This matter is before the Court on the Notice of Appeal of K.L. ("Father"), filed January 17, 2017.  Father appeals from the decision of the juvenile court overruling his objections to the Magistrate's decision awarding permanent custody of three of

Father's four children to Montgomery County Job and Family Services – Children Services Division ("Agency" or "MCCS"). We hereby affirm the decision of the juvenile court.

**{¶ 2}** Neglect and Dependency Complaints were filed on June 11, 2014, regarding K.L.1, born in 1998; C.L., born in 2000; A.L., born in 2004; and K.L.2, born in 2006. The complaints provide as follows:

Agency received a referral regarding [K.L.2,] seven years old, going to school with what appeared to be a healing bruise between his eyes. The Agency has received several referrals alleging truancy issues with this child's siblings * * * that have led to court involvement. The child gave different accounts for cause of the bruise and then stated that he fell down. MCCS met with the parents, [S.L. ("Mother") and Father] and explained the referral to them. Father started laughing about the referral because he stated that the child gets bruises all the time from playing. [Mother] stated that [K.L.2] was playing last week and he fell and hit his forehead. When Case Worker observed the house there was no furniture in the living room and dining room. There were blankets on the floor and a chest of drawers by the window had piles of clothes on top. Father explained that they were in the process of moving and he had the furniture in storage. Case Worker asked if he had the new address to the house they were moving to, Father stated that it was on [P*******] in east Dayton but he did not have the address. Case Worker asked Parents about their income and Father stated he was in construction and his income varies every month. Mother

stated that she had applied for SSI and she had a hearing coming up. Mother stated that she is bipolar and she takes abilify, tegretol, symbalta and another medication she could not recall the name. The family left the last address on [B********] and MCCS did not hear [from] the family for approximately three weeks. The Dayton school truancy officer contacted MCCS and indicated that the parent[s] were staying at [a motel] on [N**** D****]. There are allegations that both parents are doing heroin but Father refused to take a drug test. MCCS helped the family to apply for emergency funds for the deposit for housing and assisted in connecting the family to resources in the area. The family refuted the Agency's help and involvement. The parents were being charged for truancy. The parents were recently sending the children to school for the last couple of weeks of school. The family is currently staying with Father's sister but they had to leave her home by May 30, 2014.

{¶ 3} On August 5, 2014, after a hearing, the Magistrate granted interim protective custody of the four children to the Agency. The court appointed a Guardian ad Litem ("GAL") for the children, who then issued reports on September 3, 2014. The reports indicate that Mother and Father "have tested positive for opiates and have been referred for a screening through Crisis Care." The reports indicate that the GAL visited the children's home and that it has four bedrooms and two bathrooms, and that only the master bedroom contained a bed. The reports provide that Father advised the GAL that they had recently moved into the home and had to dispose of their other beds due to bed bugs, but that the Agency "will be delivering clothing and beds for the children soon."

The reports provide that Mother does not work outside the home and that Father, a mason by trade, has been taking some small construction jobs and plans to return to his union to seek employment. The GAL recommended that interim protective custody of the children continue.

{¶ 4} On September 11, 2014, after a hearing, a Magistrate's Order of Adjudication was filed for each child. The Order provides that "[a]ll parties stipulate to the facts of the complaint. Based upon the evidence and testimony presented, the Court finds that the children are within the provisions of Title 2151 of the Ohio Revised Code and are dependent and neglected children."

{¶ 5} On September 26, 2014, the GAL issued reports noting that he had visited the children's home on September 17, 2014. The reports indicate that Mother answered the door and advised that everyone in the home was ill, and that none of the children went to school that day due to illness. The GAL noted that he observed a mattress wrapped in plastic at the bottom of the stairs leading to the bedrooms. The reports indicate that the GAL returned to the home on September 22, 2014, before 8:00 a.m., and there was no answer despite several knocks on the door. The reports indicated that the GAL met with the caseworker, Adrianna Sutton, and learned that both parents submitted samples for drug screenings, and that Mother tested positive for opiates and Father tested positive for oxycodone and opiates. The GAL recommended that the court grant protective supervision to the Agency. Also on September 26, 2014, after a hearing, the juvenile court granted interim temporary custody to the Agency.

{¶ 6} The GAL issued further reports on November 7, 2014. On December 3, 2014, a "Magistrate's Decision and Judge's Order of Temporary Custody" was filed. It provides

in part:

> The Court finds that a case plan has been established for the family. At this time, neither parent has remedied the concerns of the case plan. The parents have not complied with drug treatment and have missed their appointments. The agency and Guardian ad Litem continue to have concerns with the overall conditions of the home. Father was recently jailed for about two weeks for a traffic related offense. The parents did testify that they are in agreement with temporary custody to Montgomery County Children Services.

On the same date, Seek Work Orders were issued to Mother and Father.

{¶ 7} On May 18, 2015, the Agency filed a "Motion and Affidavit for a First Extension of Temporary Custody." The affidavit of Adrianna Sutton provides in part that the "parents continue to have ongoing substance abuse issues. The parents have implied to MCCS that they actively using [sic] drugs. Mother was arrested on April 2, 2015 for possession of heroin and cocaine. Charges are still pending in this matter." The affidavit provides that "Father was arrested at the same time as Mother for driving under suspension. He has since been convicted." The affidavit further provides that the Agency has not been able to conduct regular home visits, and that the only time the Agency can contact the parents is at visitation with the children at the Agency. Sutton averred that the parents visit the children regularly every Thursday from 5:00 p.m. until 7:00 p.m., and that there "have been several incidents causing concern during visitation," including Father striking K.L.2 on the mouth. The affidavit provides that Father "has a tendency to be disruptive in visitation and fails with following the directions of Agency

staff. As a result, the agency would like to request that visits remain supervised at this time." The affidavit provides that the children were placed in foster care in September 2014 and are doing well and attending school regularly, with improved performance and grades. The affidavit provides that due to "ongoing substance abuse issues, and until there is further progress and verification on case plan objectives, MCCS believes that a First Extension of Temporary Custody is appropriate."

{¶ 8} On July 16, 2015, the Magistrate issued an order of continuance on the hearing on the Agency's motion for an extension of temporary custody, noting that "the attorneys have been unable to contact their clients." On September 18, 2015, after a hearing, a "Magistrate's Decision and Judge's Order Granting a First Extension of Temporary Custody" was issued, granting an extension until December 11, 2015. The order provides that the children are doing well in foster care and are placed together, and that they "have expressed that they want to remain in foster care." According to the order, the "mother no longer has housing and has not engaged in substance abuse treatment. She was recently jailed and has felony drug charges pending. The caseworker is unaware of her whereabouts and she has not visited with the children since June of 2015." The order further provides that "father has been jailed since May 2015 in Mercer County and is charged with 29 counts of breaking and entering, theft, and safe cracking. His charges are pending. He is unable to care for the children and wants the children placed with family members. However, no home studies have been approved on any family members at this time."

{¶ 9} On October 30, 2015, the Agency filed a "Motion and Affidavit for Commitment to the Permanent Custody of MCCS." The affidavit of Adrianna Sutton

provides that "Mother stopped visiting the children in June 2015. Father stopped visiting in May 2015, when he was arrested. Father remains jailed in Mercer County awaiting trial. * * * Father calls the children weekly." The affidavit further provides that Mother lacks income and housing and was recently placed in intervention in lieu of conviction after being charged with possession of heroin and cocaine. Sutton averred that "Mother has been in and out of jail three times in the last four months." The affidavit provides that Father also lacks income and housing and continues to struggle with substance abuse. According to Sutton, Father was awaiting trial on several charges "related to breaking into several houses in Mercer County." It provides that the children are doing well in their foster home and attending school regularly.

{¶ 10} The record reflects that a pretrial hearing was held on November 3, 2015, on the Agency's motion, and a permanent custody hearing was scheduled for January 14, 2016. On January 13, 2016, the GAL filed a report recommending that the Agency receive permanent custody of the children.

{¶ 11} At the permanent custody hearing, Mother testified that she agrees to the termination of her parental rights, and after ascertaining her understanding of the results thereof, the Magistrate found that her "agreement is knowingly, intelligently and voluntarily given."

{¶ 12} H.C. (hereafter "H.") testified that she is the children's foster mother, and that they have resided with her since September 27, 2014. She testified that they call her "Momma," or "Mom." She stated that K.L.2 takes medication for ADHD but that none of the children have special needs. She stated that none of the children have an individual education plan, and that they attend school every day. H. stated that when the

children came into her care, K.L.1 was on academic probation for missing school, C.L. was in the seventh grade and reading at a fourth grade level, A.L. was in the third grade and reading at a first grade level, and K.L.2 was not reading at all. She stated that all of the children are reading and that A.L. is on the honor roll with perfect attendance. H. stated that the "only school that's been missed has been for an excused absence. I've had no skipping school, no run away, no juvenile delinquent. They're really good kids." Specifically, H. stated that C.L. was very far behind and has had some testing done because she never learned multiplication. H. stated that testing indicated that C.L. does not have a learning disability but that "it's just something she never learned. She's very bright." H. stated that she works with C.L. on her pre-algebra.

{¶ 13} H. stated that she is in the process of adopting a three-year old and a four-year old who also live in her home. H. stated that she has enough room and income for all of the children. When asked how Father's four children get along with the younger two children, H. responded, "[t]hey are sisters and brothers. * * * and so they are bonded. The six of them are bonded." H. testified that her grandparents, mother and sister live in town, and that she has adopted brothers and sisters nearby. She stated that the children call her mother "grandma" and her sister "aunt," and that "they will tell you that it doesn't take blood to be family." She stated that the children are included in family functions and holidays with her family, including a family dinner every Sunday, and that they "have a sense of pride. Something to belong to."

{¶ 14} H. stated that she loves the children and that they have "been handed a set of cards that they have no clue what to do with * * *. They love mom. They love dad. * * * But at the same time, they don't want to go back to the same thing they came from."

She stated that the children communicate with their parents on the phone. She stated that Father is allowed to call "from four until seven. I have to put a cut off time, though, because the younger ones have a bedtime and they go to sleep." H. testified that Father "gets aggravated when he gets on the phone with [the children] because of the situation that he's in. So oftentimes, he's told [C.L.] that she's not his. He called [K.L.1] the 'B' word. So [K.L.1] refuses to talk most of the time because he gets mad and hollers at her, so she doesn't want to get on the phone."

{¶ 15} H. stated that before Father was incarcerated, there were extended periods of time where the children lost contact with him. She stated that he resumed phone contact after he was incarcerated. H. testified that from the time Father was incarcerated he has had no visitation.

{¶ 16} During the time of supervised visitations at the Agency, H. stated that Mother and Father "showed up. They would just be late." H. stated that she remained in the waiting room for the visitations and that a few times she observed that Mother and Father "were under the influence" when they arrived. She stated that Father often "nodded off," and that the children "took pictures with him when he was nodding off."

{¶ 17} H. stated that if the Agency were to obtain custody of the children, she would like to adopt them. She stated that she is not aware of any obstacles to her doing so, and that she has advised the Agency of her intention. She stated that "[e]verybody works together. We all have our moments; everybody doesn't have a great day. But we're just so used to doing what we do that we don't know anything different at this point. And I think to switch that up on them after they've already been switched so many times wouldn't be positive for them."

{¶ 18} Adrianna Sutton testified that she has been the children's caseworker for 18 months. She stated that the children have been in the Agency's care continuously since September 26, 2014. Adrianna stated that H.'s home is appropriate, and that she has everything she needs to provide for the children. Adrianna testified that when she visits the home the children "appear to be happy. Every time I go there, * * * they are relaxed and they are having a good time." She stated that the children are bonded to the other two children in the home and to H. Adrianna stated that the children are very anxious about their long term placement, and she stated that they "want permanency. They have stated that to me. They are very happy where they're at. They don't want to leave. So these are all the things they * * * tell me every month when I see them."

{¶ 19} Adrianna testified that K.L.1, C.L., and K.L.2 have been in counseling since October 2014. She testified that she has "off and on" contact with their counselor, and that "she said they are making progress. They're * * * coming to peace of mind with where the case is at, what the relationship with their parents is going to be in the event that they are adopted by [H.]."

{¶ 20} Adrianna testified that she went over Father's case plan objectives with him "many times," and that he fully understood them. She stated that Father "took all the referrals. He told me he was going to follow through and make appointments." Adrianna stated that his objectives were to get a substance abuse assessment and follow the recommendations therefrom, to obtain lawful income and housing and provide verification thereof, and to sign releases of information. She stated that Father was referred to Crisis Care, and that he attended an appointment there in August 2014. She stated that he was referred for intensive outpatient services along with Suboxone treatment. She

stated that Father "didn't go to the appointment with the doctor to get on the Suboxone." Adrianna stated that she "didn't have a chance to follow through because prior to his incarceration, he was in and out of jail here in Montgomery County. So I was not in contact with him. I mean, it was difficult for me to find him. I went to the house. I * * * left contact letters. Their phone numbers were not working." Adrianna stated that Father did not engage in a substance abuse program. She stated that since he has been incarcerated, he has not provided her with any information that he participated in a substance abuse program while incarcerated. Adrianna stated that she does not consider the objective regarding treatment for substance abuse completed. She further testified that Father never signed any releases of information.

{¶ 21} Regarding employment, Adrianna stated that Father has been incarcerated for nine months and has no income. Adrianna stated that Father was transported to the hearing from the Mercer County Jail. She stated that he used to work in construction as an independent contractor, and that prior to his incarceration, he provided some "invoices from jobs he was doing," but that he did not have a regular paycheck. She stated that his work slowed down in the winter. Adrianna stated that she visited the family's home and that Father told her he was renting it from a friend, but that she never saw a lease. She stated that "there were times that I went * * * to the house and tried to contact them, and it appeared that nobody was staying there." She stated that Father no longer has a residence there, and that his housing and income objectives are not complete.

{¶ 22} Adrianna stated that Father is facing felony charges, and that she "tried to contact the Prosecutor in the case, and he called me back, but we missed each other, so

I was not able to find anything out." She stated that Father has a co-defendant.

{¶ 23} Adrianna stated that visitation for Father and Mother was scheduled to take place on Thursdays from 5:00 to 7:00 p.m. She stated that before Father was incarcerated, "they were consistent with visitation." She stated that Father has not visited since his incarceration. She stated that his last visit was in May 2015. Adrianna stated that Father "calls on a regular basis" from jail to speak to the children. When asked why the visits were supervised, Adrianna responded that there were "allegations that the parents could be under the influence; also inappropriate conversations with the children, making promises, as far as when you guys are coming home. * * * Another issue was that, you know, there was one occasion that [Father] disciplined [K.L.2] during the visit, and he hit him on the mouth. And that was like a concern."

{¶ 24} Adrianna stated that Father provided the name of his step-sister as someone who could care for the children, but that she would not pass a home study because she has no income and not enough room in her home for all of the children to stay. Adrianna stated that she also received a call from another relative on Father's side, but that she "had a history with the Agency, and she didn't have custody of her son for a while. * * * Also, there were allegations that * * * she's addicted to marijuana and Xanax. And we had an incident about [her] passing marijuana to [K.L.1] when she came to the independent living classes at the Agency." Adrianna stated that this relative would not pass a home study. Adrianna stated that she is not aware of any willing or appropriate relatives with whom to place the children, and that the Agency "would like to get permanent custody of the children so that they can be adopted, finding a permanent, loving home for them." She stated that "we have recommendations from the counselor

from SAFY saying that separating the children would be detrimental to their development."

{¶ 25} Adrianna stated that she is not aware of any obstacles to H.'s adoption of the children, and that it would be a positive placement for them. Adrianna stated that she does not believe that reunification is possible in the foreseeable future, and that permanent custody to the Agency is in the children's best interest. She stated that the Agency has provided "[c]ase management services; information and referral services; substitute care; independent living classes; and education support" to the family.

{¶ 26} On cross-examination, Adrianna stated that she did not visit Father in jail to review the case plan. She stated that she sent correspondence to him via ordinary mail, and that he had the Agency's address as it was on the envelopes she sent. Adrianna stated that she has not received any documentation from Father that he is attending substance abuse classes in jail, and that she did not know that Father was taking classes. The following exchange occurred:

Q. Does it change your opinion, had you known that father had attended these classes; would it change your opinion that a second extension of temporary custody would be in the children's best interest?

A. No.

Q. What kind of substance abuse documentation and/or classes were you looking for?

A. We're looking for intensive treatment. I don't know the extent of the treatment that he has received. And I don't know anything about what that entails. Also, I am also looking for - - for him to demonstrate some

behavioral changes; and specifically, how he's going to function in society once he's out.   * * *

* * *

Q.  Did you send him a release of information at the Mercer County Jail?

A.  No, I have not.   I had no knowledge that he was receiving services there.   He did not say anything about that the day he called me.

* * *

Q.  So he couldn't complete that case plan objective because he had nothing to sign?

A.   No. Not really.   Because he didn't come forward with information.   He knows what the expectations are on the case plan.   He knows that was one [of] his objectives.   He could have called me and said that on the phone.

**{¶ 27}**  Regarding the incident where Father struck K.L.2, Adrianna stated that Father "said that he was disciplining him, but he was asked to not do that.   And he confronted the family support worker and was not receptive to her advice to step back. And she had to get the Sheriff on duty involved, and he was asked to leave."

**{¶ 28}** When asked why permanent custody is a better disposition for the children than a second extension of temporary custody, Adrianna responded as follows:

I believe the parents have had ample time to work on the case plan. I'm also concerned about permanency for the children.   The children are making amazing progress.   They are resilient.   And I believe that that can

impact them in a negative way, emotionally and psychologically. We already seen [sic] some anxiety and some detrimental things. It's been hard to keep them on track. So I believe at this point they've had enough time to work on their case plan.

{¶ 29} In the course of cross-examination by counsel for K.L.2, Adrianna stated that she sent Father correspondence in the jail advising him of the court date and that the children were doing well. She stated that she "requested that he inform me if he was receiving services." She stated that she had a brief conversation with Father in October 2015, and that it was a three-way-call with Father and his father. Adrianna stated that the call ended abruptly after Father and his father got into an argument, and that Father told her he would call her back but did not do so.

{¶ 30} The following exchange occurred on redirect examination:

Q. You indicated that you were looking for father to demonstrate changes. And that would be once he gets out of jail, correct?

A. Correct.

Q. So he would need some - - he can't start doing that until he gets out, right?

A. Correct.

Q. And one month of this six month extensions is already gone by because that would have started December 11, right?

A. Right.

Q. So in the next five months, do you foresee that father would be able to demonstrate, if he were to get out of jail, that he's satisfactorily

addressed all the case plan objectives?

A.   No.

**{¶ 31}** At the conclusion of the hearing, the GAL indicated that he recommends permanent custody be granted to the Agency.

**{¶ 32}** In awarding custody of the children to the Agency, the Magistrate considered the factors set forth in R.C. 2151.414(E) and the best interest factors set forth in R.C. 2151.414(D)(1).   The court found that once the children were in foster care, "the mother and father have failed to remedy the problems that caused the children to be placed outside of their home despite reasonable case planning and diligent efforts by the caseworker."   The Magistrate determined that Mother and Father failed to take advantage of resources made available to them, and that they "failed to demonstrate long term sobriety and stability with housing," and failed to address substance abuse issues. The Magistrate noted that Mother was jailed in October 2015 for felony drug possession and the father has been jailed since May 2015.   The court found that the parents "suffer from chronic chemical dependency," and that they "have demonstrated a lack of commitment to the children by failing to regularly visit and support the children and they have shown an unwillingness to provide an adequate permanent home for them." The Magistrate noted that Father remains jailed, and that a possible release date cannot be determined.   The Magistrate found that Mother abandoned the children.   The Magistrate concluded that the Agency demonstrated "by clear and convincing evidence that the children cannot be placed with either parent within a reasonable time period or should not be placed with either parent."

**{¶ 33}** Regarding the best interest factors, the Magistrate specifically found H.'s

testimony to be credible, and noted that she "is very clearly bonded to the children who have thrived in her home." The Magistrate further noted that the children bonded to H.'s extended family. The Magistrate noted that H. wants to adopt all of the children. The Magistrate noted the children's marked academic progress. The Magistrate indicated that the children have "some relationship with their parents but those relationships have diminished because of the circumstances. The father did not consistently visit with the children from September 2014 until his incarceration in May 2015. He has maintained phone contact with the children but that phone contact is not always positive." The Magistrate noted H.'s testimony that she "has observed the children become upset following conversation with their father." The Magistrate found that "the children's most significant relationships are with the foster mother who wants to adopt them and her extended family."

{¶ 34} Regarding the children's wishes, the Magistrate noted that in camera interviews with the children were conducted on November 3, 2015. The Magistrate noted that K.L.1, who was 17 at the time, "is very bonded to her foster mother and thinks of her as her real mom." The Magistrate noted that K.L.1 wants to be adopted by H. The Magistrate noted that A.L., who was 11 at the time, "shared with the Court that she understands the meaning of permanent custody and adoption" and expressed that she "is perfectly fine with being adopted by [H.] and that there is no one else to care for her." The Magistrate noted, however, that A.L. indicated to the GAL at the time of his January 2016 report that she would also like to live with her parents. The Magistrate noted that C.L., who was 15, "shared with the Court that she understands the meaning of permanent custody and adoption" and "is happy with [H.] and wants to be adopted by [H.] and remain

with her siblings. She was very clear that she did not want to be separated from her siblings." The Magistrate indicated that K.L.2, who was nine, "has mixed emotions about permanency. He does understand the concept of permanent custody." According to the Magistrate, K.L.2 "would want to stay with his siblings and be adopted by [H.]; however, he would also rather stay with his father in jail. [K.L.2] also expressed to the Guardian ad Litem that he would like to live with his parents."

{¶ 35} The Magistrate noted that the children have been in Agency custody since September 26, 2014. The Magistrate found that "a legally secure permanent placement for these children cannot be achieved without a grant of permanent custody" to the Agency. The Magistrate concluded that the Agency has established by clear and convincing evidence "that permanent custody is in the best interest of the child."

{¶ 36} Father filed objections to the Magistrate's decision granting permanent custody of the children to the Agency on April 7, 2016, requested a transcript of proceedings, and requested an extension of time to supplement his objections. On October 28, 2016 Father filed supplemental objections. He asserted in part as follows:

> * * * Prior to Father's pretrial incarceration Father worked and verified his independent contractor income. * * * Additionally, prior to his jail stay, Father was living with a friend in a house. * * * The caseworker testified that Father did not sign any releases of information. * * * Finally, when asked about visitation, the caseworker stated, "I would say they were consistent with - - with visitation when they - - when they were - - when [Father] was still free." * * * Contrarily, the Magistrate found, "[t]he mother and father have failed to visit or communicate with the children." * * * As of this filing, Father

is not currently incarcerated.

The caseworker acknowledged that she did not ask for substance abuse documentation while he was incarcerated. * * * She had talked to him one time, briefly, since May, 2015 until the trial date in January, 2016. * * * She did not visit him in jail. * * *  Yet, the Magistrate found, "[t]he agency has attempted to contact and involve the legal father of the children with the reunification process."  * * * The caseworker did not know if Father attended any treatment programs while he was incarcerated. * * * Further, the caseworker did not send Father any release of information documents for him to sign while he was incarcerated. * * * At the time of the hearing, Father had not gone to trial or been convicted of the charges for which he was incarcerated. * * * The caseworker opined that Father loves his children. * * * The foster mother testified that the children love dad, unconditionally.  * * * And, the children would want to see their Father when he is released.  One of the children would prefer to live with Father while he is incarcerated.

Although the Magistrate considered the best interest factors * * *, they were not supported by clear and convincing evidence.  The Magistrate relied heavily on the testimony of the foster mother, relative to the interrelationships of the children, who planned on adopting the children.  It was noted that [K.L.2] wants to live with his father.  Additionally, it was found that [K.L.1] wants to be adopted by the Foster Mother, yet [the Agency] filed a Motion to Terminate Permanent Custody of [K.L.1] and it

was recently granted. Father contends that a grant of a second extension of temporary custody was in the best interest of the children.

{¶ 37} The Agency responded to the objections on November 28, 2016. In overruling Father's objections, the court noted that by

> * * * Magistrate's Decision and Judge's Order filed October 7, 2016, temporary custody of [K.L.1] to [the Agency] was terminated and found to be in said child's best interests because [she] had turned eighteen* * * years of age and no longer wanted to remain in foster care. Accordingly, by the same Magistrate's Decision and Judge's Order, the objection pending regarding [K.L.1] was withdrawn as moot. Accordingly, the Court DISMISSES the same.

{¶ 38} The court noted that Father failed to complete a substance abuse assessment and follow all recommendations; that he failed to obtain lawful income and provide verification to the Agency; that he failed to obtain housing and provide verification to the Agency; and that he failed to sign information releases. The court concluded that the Agency "presented clear and convincing evidence that permanent custody is in the best interest of these children." The court found that placement with Father "is not possible within a reasonable time due to his failure to remedy the problems that initially caused the children to be placed outside the home." The court noted that there are no other potential placements for the children.

{¶ 39} Father asserts the following assignment of error:

> THE DECISION OF THE JUVENILE COURT TO GRANT PERMANENT CUSTODY IS AGAINST THE MANIFEST WEIGHT OF THE

EVIDENCE.

{¶ 40} Father argues that the trial court erred in finding that he failed to make substantial progress on his case plan objectives, and that a legally secure placement for the children can best be achieved by granting permanent custody to the Agency. Father asserts that the "judge erred in making these findings because [Father] had income and housing before he was locked up in the Mercer County Jail and could establish income and housing again. Also, since he is released, he can easily sign the releases the caseworker needs (which she did not send to the jail)." He asserts that he "can get a substance abuse assessment and begin treatment forthwith." Finally, Father argues that the "judge should have granted an extension of temporary custody."

{¶ 41} The Agency responds that the evidence presented at the hearing established by clear and convincing evidence that granting permanent custody of C.L., A.L. and K.L.2 to it was in the children's best interest and not against the manifest weight of the evidence. The Agency asserts that by the time of the January 14, 2016 trial, the children had been in its temporary custody for sixteen consecutive months, satisfying R.C. 2151.414(B)(1)(d). The Agency further asserts that the best interest factors in R.C. 2151.414(D)(1) weigh in favor of the trial court's decision regarding permanent custody.

{¶ 42} We note that the Agency sought permanent custody by filing a motion after obtaining temporary custody, and that the two-part test set forth in R.C. 2151.414 applies.

{¶ 43} R.C. 2151.414 provides:

* * *

(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines

at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

* * *

(d) The child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two month period * * *

* * *

For the purpose of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

{¶ 44} The statutory best-interest factors in R.C. 2151.414(D)(1) include the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history, including whether the child has been in

the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶ 45} We note that the factors in R.C. 2151.414(E)(7) through (11) "include convictions of various crimes like homicide, assault and child endangerment, and withholding food or medical treatment from a child." *In re K.S. & K.S.*, 2d Dist. Clark No. 2008 CA 77, 2009-Ohio-533, ¶ 21.

{¶ 46} As this Court has previously noted:

A reviewing court must affirm a trial court's decision regarding permanent custody unless it is unsupported by clear and convincing evidence, a level of proof that produces a firm belief as to the facts sought to be established. *In re A.U.*, Montgomery App. Nos. 20583, 20585, 2004-Ohio-6219, ¶ 17. A trial court's "decision to terminate parental rights will not be overturned as against the manifest weight of the evidence if the record contains competent, credible, evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re B.F.*, Miami App. No. 2008 CA 11, 2008-Ohio-5156, ¶ 9.

*In re H.T. & Z.T.*, 2d Dist. Greene Nos. 10-CA-29, 10-CA-30, 2011-Ohio-1285, ¶ 24.

**{¶ 47}** As the Agency asserts, A.L., C.L., and K.L.2 had been in Agency care for more than 12 months of a consecutive 22 month period at the time of trial. The children were adjudicated neglected and dependent by the Magistrate on September 11, 2014, and the Agency was granted interim temporary custody on September 26, 2014. On October 30, 2015, the Agency filed its motion for permanent custody, and by the time of trial, the three children had been in the temporary custody of the Agency for 16 consecutive months. In other words, R.C. 2151.414(B)(1)(d) is satisfied.

**{¶ 48}** We further conclude that the record contains competent, credible evidence that the grant of permanent custody to the Agency is in the best interest of the children, and that the trial court's decision is accordingly not against the manifest weight of the evidence. Regarding the children's interactions and interrelationships with others, we conclude that their relationships with each other, and with H. and her family, are most significant to them. The children refer to H. as "Mom," or "Momma," and to her family members as "aunt" and "grandma." It is clear from H.'s testimony, which the Magistrate specifically found credible, that the three children are bonded to their entire foster family, and that H. is meeting all of their needs, as well as providing academic support for them. H. testified that the children enjoy their family dinners on Sundays, and that they "have a sense of pride. Something to belong to." H. noted that while the children love Mother and Father, they do not want to return to the situation from which they were removed.

**{¶ 49}** Regarding Father, H. stated that before he was incarcerated, there were extended periods of time where the children lost contact with him. Adrianna testified that Father had not visited the children since he was incarcerated. She stated that his

visitations were supervised due to allegations that he and Mother appeared to be under the influence during visits, that inappropriate conversations took place with the children, and that one time Father struck K.L.2 and had to be removed from the visitation. H. further testified that Mother and Father were under the influence during visitations, and that Father often "nodded off." Although he phoned the children regularly, H. testified that Father "gets aggravated when he gets on the phone," and that he told C.L. that she is not his, that he called K.L.1 the " 'B' word" and "hollers at her." Adrianna stated that Father failed to complete his case plan objectives. We conclude that the children's interactions and interrelationships support the trial court's decision.

{¶ 50} Regarding the children's wishes, we note that the Magistrate indicated that all three children were happy and thriving in H.'s care and expressed that they would like to be adopted by her, although A.L. and K.L.2 also indicated that they would like to live with their parents. We note that K.L.2, at age 9 and of tender years, had "mixed emotions about permanency." None of the children indicated that they did not want to live with H.

{¶ 51} Regarding the children's custodial history, as noted above, they have been in H.'s care since September 26, 2014, where their needs are being met in a stable, loving, and supportive environment. H. plans to adopt the children. In contrast, while with Mother and Father, the children lacked stable housing and furniture, repeatedly were absent from school, and were behind academically. The Agency became involved due to K.L.2 having a bruise between his eyes that was not consistently explained and due to truancy. Mother and Father tested positive for illegal drugs. We conclude that the custodial history of the children supports the grant of permanent custody to the Agency.

{¶ 52} Regarding the children's needs for a legally secure placement, we agree

that such a placement could only be achieved by a grant of permanent custody to the Agency. Adrianna's testimony was clear that the children "want permanency." She testified that Father fully understood his case plan objectives. She stated that prior to his incarceration in Mercer County, Father was "in and out of jail here in Montgomery County." She stated that she had a difficult time locating Father. Adrianna stated that when she attempted contact at the home Father was allegedly renting, it appeared that no one lived there. While Father argues that Adrianna failed to visit him in jail, and failed to provide releases for his signature, Adrianna stated that Father knew what was expected of him and knew how to get in contact with the Agency, yet failed to do so. She stated that she did not provide releases to him because she was unaware if he was attending classes in the Mercer County Jail. We note that there was no documentary evidence adduced that Father obtained any substance abuse treatment while in jail. Adrianna stated that Father was expected to undergo intensive treatment, and that he was further expected to demonstrate behavioral changes reflecting an ability to function when he is released from jail. Adrianna stated that she believed the parents had "ample time" to work on their case plans, and that Father did not complete any of his objectives. She stated that a second extension of temporary custody could "impact [the children] in a negative way, emotionally and psychologically." Based upon the evidence presented at the hearing, we conclude that a second extension of custody was not in the children's best interest.

{¶ 53} Having reviewed the record, we conclude that all of the best interest factors weigh in favor of the termination of Father's parental rights, and that clear and convincing evidence supports the grant of permanent custody to the Agency. Since the decision of

the trial court is not against the manifest weight of the evidence, Father's assigned error

is overruled.   The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

HALL, P.J. and FROELICH, J., concur.

Copies mailed to:

Alice B. Peters
Robert Alan Brenner
Hon. Nick Kuntz